

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**United States Bankruptcy Judge**

**Signed June 13, 2012**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| VITRO, S.A.B. de C.V., | § | |
| | § | Case No. 11-33335-HDH-15 |
| Debtor in a Foreign Proceeding. | § | |
| | § | |
| _____ | § | |
| | § | |
| VITRO, S.A.B. de C.V., | § | |
| | § | |
| Plaintiff, | § | |
| | § | Adversary No. 12-03027 |
| v. | § | |
| | § | |
| ACP MASTER, LTD.; AD HOC GROUP | § | |
| OF VITRO NOTEHOLDERS; | § | |
| AURELIUS CAPITAL MASTER, LTD.; | § | |
| AURELIUS CONVERGENCE MASTER, | § | |
| LTD.; ELLIOTT INTERNATIONAL | § | |
| L.P.; THE LIVERPOOL LIMITED | § | |
| PARTNERSHIP; and DOES 1-1000, | § | |
| Defendants. | § | |

### Memorandum Opinion

On March 2, 2012, Alejandro Francisco Sanchez-Mujica and Javier Arechavaleta

Santos, acting as Foreign Representatives of the above-captioned debtor, Vitro, S.A.B. de

C.V. ("Vitro SAB"), filed a *Motion of Foreign Representatives of Vitro S.A.B. de C.V. for an Order Pursuant to 11 U.S.C. §§ 105(a), 1507 and 1521 to (I) Enforce the Mexican Plan of Reorganization of Vitro S.A.B. de C.V., (II) Grant a Permanent Injunction, and (III) Grant Related Relief* ("Enforcement Motion").    Wilmington Trust, National Association ("Wilmington"), U.S. Bank National Association, as Indenture Trustee ("U.S. Bank"), and the Ad Hoc Group of Vitro Noteholders ("Ad Hoc Group") (collectively, the "Objecting Parties"), who are claimants under various indentures issued by Vitro SAB in the United States and guaranteed by its subsidiaries, responded.  On March 5, 2012, the Court heard the Enforcement Motion on an expedited basis.

In addition to the Enforcement Motion, on March 2, 2012, the Foreign Representatives filed, under seal, a *Motion for a Temporary Restraining Order and Preliminary Injunction* ("TRO Motion"), supported by 1) a *Verified Complaint for Temporary Restraining Order and Injunctive Relief*, 2) the Enforcement Motion and 3) Declarations of certain individuals.  In response, the *Objection Of U.S. Bank National Association, As Indenture Trustee, To Foreign Representatives' Motion For A Temporary Restraining Order And Preliminary Injunction* and the *Ad Hoc Group of Vitro Noteholders' Objection to Motion for Temporary Restraining Order* were timely filed with the Court.  On March 7, 2012, also on an expedited basis, the Court heard arguments for and against the TRO Motion.   On March 12, 2012, the Court entered an *Order Granting Limited Temporary Restraining Order to Maintain Status Quo* ("TRO").  The TRO was extended by the parties' agreement.

On May 25, 2012, the Objecting Parties each timely filed with the Court an objection ("Ad Hoc Noteholders Objection," "Wilmington Trust Objection," and "U.S.

Bank Objection" respectively) to the Enforcement Motion. Beginning June 4, 2012, this Court held a four day trial on the Enforcement Motion, on a schedule agreed to by the parties. Vitro SAB and the Objecting Parties put on a number of witnesses and introduced hundreds of exhibits. The Court took the matter under advisement.

## I.  Background Facts

The events leading to the Debtor's commencement of this Chapter 15 case are generally described in this Court's memorandum opinion of June 24, 2011, denying the request of the foreign representatives of Vitro SAB to enjoin lawsuits filed against its non-debtor guarantors in New York state court.[1]  As explained therein, at that time the proceedings in Mexico were in an early stage, and it was unclear whether they would be successful.[2]  This Court determined that the pre-recognition injunction should be granted in favor of Vitro SAB only, and did not find that the litigation by the noteholders against the subsidiary guarantors of Vitro SAB should be enjoined when the subsidiaries were not in an insolvency proceeding.

Thereafter, in August 2011, a group of noteholders filed suit against Vitro SAB's subsidiaries in New York state court, seeking a money judgment on certain guarantees and declaratory relief. *Wilmington Trust N.A. v. Vitro Automotriz S.A. de C.V.*, No. 652303-2011 (N.Y. Sup. Ct. filed Aug. 17, 2011).  Specifically, in addition to a judgment on their guarantees, the noteholders wanted a declaratory judgment stating that Vitro SAB's reorganization attempts would not impact their guaranties from Vitro SAB's non-debtor subsidiaries.  *Id.*  In December 2011, the New York state court ruled in favor of the noteholders, finding that the indentures prevent non-consensual modification of the

---

[1] *In re Vitro S.A.B. de C.V.*, 455 B.R. 571 (Bankr. N.D. Tex. June 24, 2011).
[2] *Id.* at 583.

subsidiaries' guaranties. *Wilmington Trust N.A. v. Vitro Automotriz S.A. de C.V.*, No. 652303-2011 (N.Y. Sup. Ct. Dec. 5, 2011).

In its decision, the New York state court noted that the subsidiaries had waived their rights under Mexican law. *Id*. On December 18, 2011, the noteholders obtained a temporary restraining order from the New York state court that enjoined the subsidiaries from giving their consent to the *Concurso* plan. *Wilmington Trust N.A. v. Vitro Automotriz S.A. de C.V.*, No. 653459-2011 (N.Y. Sup. Ct. filed Dec. 14, 2011). However, upon Vitro SAB's request, this Court, finding that the lockup agreement between Vitro SAB and its subsidiaries was an asset of Vitro SAB's estate, entered an order enforcing the automatic stay and enjoining the Noteholders' seeking injunctive relief in the New York State Court. Despite an appeal by the noteholders,[3] that order remained in effect and the subsidiaries were permitted to vote on the *Concurso* plan. The subsidiaries voted in favor of the plan and though they were insiders, their votes were counted to win approval of the plan.

On February 3, 2012, the Federal District Court for Civil and Labor Matters for the State of Nuevo León, the United Mexican States (the "District Court of Nuevo León") issued a *Concurso* Approval Order under the *Ley de Concursos Mercantiles* (the "LCM") in Vitro SAB's voluntary judicial reorganization proceeding (the "Mexican Proceeding"). After the issuance of the *Concurso* Approval Order, the objecting Noteholders continued to take actions against Vitro SAB's non-debtor subsidiaries, attempting to collect debts owed to them under various guarantees to indentures issued by Vitro SAB.[4] In response,

---

[3] *See In re Vitro S.A.B. de C.V.*, No. 11-CV-3554-F (N.D. Tex. filed Dec. 23, 2011).
[4] *See In re Vitro S.A.B. de C.V.*, 455 B.R at 575-76.

Vitro SAB filed the Enforcement Motion and sought the TRO and permanent injunction, which led to the trial upon which this opinion is rendered.

The *Concurso* Approval Order not only modifies the debts owed by Vitro SAB to the noteholders under various indentures, it also novates and extinguishes the guarantees, effectively discharging the obligations of Vitro SAB's non-debtor subsidiary guarantors to the noteholders.

In the Enforcement Motion, the Foreign Representatives ask the Court to enforce the *Concurso* Approval Order, which approves Vitro SAB's *Concurso* Plan. Specifically, the Enforcement Motion asks the Court to 1) give "full force and effect in the United States to the *Concurso* Approval Order," 2) "grant a permanent injunction prohibiting certain actions in the United States against Vitro SAB," as well as its non-debtor subsidiaries and 3) "grant certain related relief," all pursuant to §§ 105(a), 1507, and 1521 of Title 11 of the United States Bankruptcy Code.

## II.    Issues

There are two main issues that must be addressed in order to determine whether the Enforcement Motion should be granted: (1) whether the provisions of the *Concurso* Approval Order that grant a permanent injunction prohibiting certain actions in the United States against Vitro SAB's non-debtor subsidiaries may be extended to creditors in the United States by this Court through §§ 1521 or 1507 consistent with the principles of comity; and (2) if so, does the § 1506 public policy exception, which limits the extension of comity where it would be "manifestly contrary" to the public policy of this country, prevent enforcement of the *Concurso* Approval Order.

## III. Analysis

The Court has jurisdiction pursuant to 28 U.S.C. § 1334. The proceeding is core, pursuant to 28 U.S.C. § 157(b)(2)(P).

Beyond the mandatory effects of recognition of a foreign main proceeding[5] found in 11 U.S.C. § 1520, additional relief "may" be granted to protect the assets of the debtor or the interests of creditors pursuant to § 1521, as well as additional assistance that may be provided to a foreign representative of the debtor consistent with the principles of comity, pursuant to § 1507.

Under § 1521, a bankruptcy court may "grant any appropriate relief" in order to "effectuate the purpose of this chapter and to protect the assets of the debtors or the interests of the creditors." 11 U.S.C. § 1521(a). This includes, at the request of the foreign representative, entrusting "the distribution of all or part of the debtor's assets located in the United States to the foreign representative or another person, including an examiner, authorized by the court, provided that the court is satisfied that the interests of creditors in the United States are sufficiently protected." 11 U.S.C. § 1521(b).

Section 1522(b) permits the court to impose conditions on any discretionary relief that it grants either pre- or post-recognition, which permits the court to achieve an appropriate balance between the interests of creditors and other interested entities, including the debtor. *See In re Tri-Continental Exchange Ltd.*, 349 B.R. 627, 637 (Bankr. E.D. Cal. 2006); 11 U.S.C. § 1522(b).

---

[5] A "foreign main proceeding" is defined as "a foreign proceeding pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1502(4).

In addition to the relief enumerated in § 1521, § 1507(a) of the Bankruptcy Code provides that "the court, if recognition is granted, may provide additional assistance to a foreign representative." 11 U.S.C. § 1507(a). In determining whether to provide such additional assistance, courts must look to § 1507(b) for guidance, which provides that:

> (b) In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with principles of comity, will reasonably assure:
>
> 1) just treatment of all holders of claims against or interests in the debtor's property;
>
> 2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
>
> 3) prevention of preferential or fraudulent dispositions of property of the debtor;
>
> 4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and
>
> 5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b). Comity should be the Court's primary consideration when applying § 1507(b). *See In re Petition of Garcia Avila*, 296 B.R. 95, 108 n. 14 (Bankr. S.D.N.Y. 2003). Comity has been defined as the "recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protections of its laws." *Hilton v. Guyot*, 159 U.S. 113, 163-64, 16 S. Ct. 139 (1895). Granting comity to judgments in foreign bankruptcy proceedings is appropriate as long as U.S. parties are provided the same fundamental

protections that litigants in the United States would receive. *See id.* at 202-03; 16 S. Ct. at 158-59.

Vitro SAB urges the Court to defer in favor of the Enforcement Motion in the interests of comity. However, "The principle of comity has never meant categorical deference to foreign proceedings. It is implicit in the concept that deference should be withheld where appropriate to avoid the violation of the laws, public policies, or rights of the citizens of the United States." *In re Treco*, 240 F.3d 148, 157 (2d Cir. 2001); *see also, Overseas Inns S.A., P.A. v. United States*, 911 F.2d 1146 (5th Cir. 1990) (comity was not accorded to Luxembourg bankruptcy plan that treated IRS as general, rather than priority, creditor); *In re Schimmelpenninck*, 183 F.3d 347, 365 (5th Cir.1999) ("foreign laws . . . must not be repugnant to our laws and policies").

### Public Policy Exception--§ 1506

If the Court finds that the *Concurso* Approval Order should be enforced, pursuant to § 1507, then the Chapter 15 of the Bankruptcy Code provides a final hurdle for Vitro SAB to overcome in the public policy exception found in § 1506. Specifically, § 1506 provides that "[n]othing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the Untied States." 11 U.S.C. § 1506.

The parties spent much of their time on this issue. Unfortunately, the Bankruptcy Code does not define what should be considered "manifestly contrary to the public policy of the United States." Therefore, this Court must look to the legislative history and to relevant case law for guidance.

Although few published opinions discuss the scope of section 1506, "it appears well settled that the exception is to be construed narrowly." *In re British Am. Isle of Venice, Ltd.,* 441 B.R. 713, 717 (Bankr. S.D. Fla. 2010) (citing *In re Qimonda AG Bankr. Litig.,* 433 B.R. 547, 567-70 (E.D. Va. 2010)). Further, it should be "invoked only under exceptional circumstances concerning matters of fundamental importance for the United States." *In re Ran*, 607 F.3d 1017, 1021 (5th Cir. 2010) (citing *In re Iida*, 377 B.R. 243 (9th Cir. BAP 2007)); *In re Atlas Shipping A/S*, 404 B.R. 726 (Bankr. S.D.N.Y. 2009); *In re Ernst and Young, Inc.*, 383 B.R. 773, 781 (Bankr. D. Colo. 2008)). "The word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States." *In re Ephedra Prods. Liability Litig.*, 349 B.R. 333, 336 (S.D.N.Y. 2006) (citing H.R. REP. NO. 109-31(I), at 109, as reprinted in 2005 U.S.C.C.A.N 88, 172).

Despite § 1506's limited scope, the statute has also been described as a "safety valve"[6] that offers "specific protections"[7] to creditors in Chapter 15 proceedings. When determining whether to apply § 1506,

> courts have focused on two factors: (1) whether the foreign proceeding was procedurally unfair; and (2) whether the application of foreign law or the recognition of a foreign main proceeding under Chapter 15 would 'severely impinge the value and import' of a U.S. statutory or constitutional right, such that granting comity would 'severely hinder United States bankruptcy courts' abilities to carry out … the most fundamental policies and purposes' of these rights.

*Id.* (quoting *In re Qimonda AG Bankr. Litig.*, 433 B.R. at 568-69) (citations omitted).

---

[6] *In re Basis Yield Alpha Fund (Master)*, 381 B.R. 37, 45 n.27 (Bankr. S.D.N.Y. 2008).
[7] *In re Tri- Cont'l Exch. Ltd.*, 349 B.R. 627, 638 (Bankr. E.D. Cal. 2006).

Although not much case law exists, several courts have recently considered the § 1506 public policy exception.  Because Chapter 15 of the Bankruptcy Code was not enacted until 2005, the scope of § 1506 has not yet been clearly defined.  Therefore, a review of some of the more recent cases is helpful.

In *In re Ephedra Prods. Liability Litig.*, the bankruptcy court had to determine whether granting an order recognizing and enforcing an order of the Canadian insolvency tribunal would violate § 1506.  349 B.R. 333 (S.D.N.Y. 2006).  The Canadian order at issue approved a claims resolution procedure that provided for mandatory mediation, which could result in the liquidation of claims by creditors who never approved of the plan.  *Id.* at 335.  Some of the claimants argued that the foreign "procedure was manifestly contrary to U.S. policy because it deprived them of due process and a jury trial."  *Id.*  The bankruptcy court looked to the legislative history and found that the word "manifestly" is restrictive so that the public policy exception should be "narrowly interpreted."  *Id.* at 336.  Looking at an 1895 Supreme Court decision, *Hilton v. Guyot*, 159 U.S. 113, 16 S. Ct. 139 (1895), the *Ephedra* court added that foreign judgments should be recognized and enforced when the foreign "'proceedings are according to the course of a civilized jurisprudence,' *i.e.*, fair and impartial."  *In re Ephedra Prods. Liability Litig.*, 349 B.R. at 336 (quoting *Hilton,* 159 U.S. at 205-06).

With respect to the claimants' due process argument, the court acknowledged that there was at least some merit to the objection because the Claims Officer had originally refused to receive evidence and to liquidate claims without granting interested parties an opportunity to be heard.  *Id.* at 335.  However, the bankruptcy court ultimately rejected the due process argument because the Ontario Court adopted amendments to the

Canadian order that cured the due process problems.  *Id*.  With respect to the claimants'
second argument, based on deprivation of their right to a jury trial, the court held that
"neither § 1506 nor any other law prevents a United States court from giving recognition
and enforcement  . . .  simply because the procedure alone does not include a right to
jury."  *Id*. at 335-36.  Although the bankruptcy court recognized that the constitutional
right to a jury trial is important to the American legal system, it did not find that a jury
trial is absolutely necessary in order to have a fair and impartial verdict.  *Id.* at 337 (citing
*Evangelical Alliance Mission*, 930 F.2d 764, 768 (9th Cir.1991); *In re Union Carbide
Corp. Gas Plant Disaster at Bhopal*, 809 F.2d 195, 199, 202 (2d Cir.1987)).  Because the
court found that the claimants' real complaint had to do with the loss of leverage during
settlement  negotiations,  the  court  rejected  the  argument.   *Id*.   It  explained  that
"[d]eprivation  of  such  bargaining  advantage  hardly  rises  to  the  level  of  imposing  on
plaintiffs some fundamental unfairness."  *Id*.

In *In re Qimonda AG Bankr. Litig.*, the United States District Court discussed the
§ 1506  public  policy  exception  at  length.    433  B.R.  547,  567-71  (E.D.  Va.  2010).
Qimonda,  a  German  company  and  producer  of  computer  chips,  claimed  to  hold
approximately  12,000  patents,  including  at  least  4,000  U.S.  patents  and  over  1,000
pending U.S. patent applications.  *Id*. at 552.  Before the commencement of insolvency
proceedings in Germany, Qimonda entered into various joint venture and patent cross-
licensing  agreements  with  international  electronic  companies.   *Id*.   In  the  foreign
insolvency  proceeding,  Qimonda  sought  to  terminate  these  patent  cross-licensing
agreements.  The attorney appointed as Insolvency Administrator of Qimonda's estate

filed a petition for recognition of the German insolvency proceeding in the U.S. Bankruptcy Court. *Id.*

The bankruptcy court below in *In re Qimonda AG*, had a hearing and issued two orders. *Id.* at 552 (discussing *In re Qimonda AG*, 2009 WL 4060083 (Bankr. E.D. Va. 2009) (No. 09-14766-RGM), *aff'd in part, remanded in part sub nom. In re Qimonda AG Bankr. Litig.,* 433 B.R. 547 (E.D. Va. 2010)). According to the United States District Court, "[t]he first order correctly recognized the insolvency proceeding as a 'foreign main proceeding.'" *Id.* (citing 11 U.S.C. § 1517). The second order granted discretionary relief to Qimonda and the Insolvency Administrator, including a paragraph that made particular "provisions of the Bankruptcy Code applicable to Qimonda's Chapter 15 proceeding." *Id.* at 552-53. After the bankruptcy court issued the orders, the Insolvency Administrator sent letters to some of the international electronic companies in order to elect nonperformance of their patent cross-licensing agreements pursuant to German Insolvency Code Section 103. *Id.* at 553. In response to these letters sent on behalf of Qimonda, certain international electronic companies argued that election of these agreements was impermissible under § 365(n) of the U.S. Bankruptcy Code, which was made applicable by the bankruptcy court's second order. *Id.* In order to resolve the dispute, the Insolvency Administrator filed a motion with the bankruptcy court seeking to amend the second order. *Id.* The bankruptcy court granted the motion and issued a new order, stating that:

> [t]he application of section 365 to the instant proceeding shall not in any way limit or restrict (i) the right of the Administrator to elect performance or nonperformance of agreements under § 103 German Insolvency Code or such other applicable rule of law in the Foreign Proceeding, or (ii) the legal consequence of such election; provided,

> however, if upon a motion by the Administrator under
> Section 365 of the Bankruptcy Code, the Court enters an
> Order providing for the assumption or rejection of an
> executory contract, then Section 365 shall apply without
> limitation solely with respect to the contracts subject to
> such motion.

*In re Qimonda AG Bankr. Litig.* at 553-54 (citation omitted).  The bankruptcy court also

revised the second order.  Specifically, it added the following language to the paragraph

making certain provisions of the U.S. Bankruptcy Code applicable: "provided, however,

Section 365(n) applies only if the Foreign Representative rejects an executory contract

pursuant to Section 365 (rather than simply exercising the rights granted to the Foreign

Representative pursuant to the German Insolvency Code)."  *Id.* at 554 (citation omitted).

On appeal, the international electronic companies argued that "the Bankruptcy

Court erred in conditioning the applicability of § 365(n) on the Foreign Representative's

formal rejection of the parties' cross-licensing agreements under the Bankruptcy Code."

*Id*. at 554.  The district court focused on "whether § 365(n) embodies the fundamental

public policy of the United States, such that subordinating [it] to German Insolvency

Code § 103 is an action 'manifestly contrary to the public policy of the United States.'"

*Id*. at 565 (citing 11 U.S.C. § 1506).  The district court reviewed applicable case law and

found three guiding principles for analyzing whether an action taken in a Chapter 15

proceeding is manifestly contrary to the public policy of the United States:

> 1) The mere fact of conflict between foreign law and
>    U.S. law, absent other considerations, is insufficient
>    to support the invocation of the public policy
>    exception.
>
> 2) Deference to a foreign proceeding should not be
>    afforded in a Chapter 15 proceeding where the
>    procedural fairness of the foreign proceeding is in

doubt or cannot be cured by the adoption of additional protections.

3) An action should not be taken in a Chapter 15 proceeding where taking such action would frustrate a U.S. court's ability to administer the Chapter 15 proceeding and/or would impinge severely a U.S. constitutional or statutory right, particularly if a party continues to enjoy the benefits of the Chapter 15 proceeding.

*Id*. at 570.  The district court found that, based on the record, it was unclear whether the three principles were applied to "the Bankruptcy Court's decision to condition the applicability of § 365(n) on the formal rejection of an executory contract under the Bankruptcy Code."  *Id*.  Instead, the bankruptcy court merely held that U.S. courts administering Chapter 15 proceedings must "cooperate on an international basis and … give precedence to the [foreign] main proceeding."  *Id. at* 570-71 (citing *In re Qimonda AG*, 2009 WL 4060083, at *2).  Therefore, the district court remanded the case to the bankruptcy court so that it could be determined whether there had been a violation of fundamental U.S. public policies under § 1506.  *Id*. at 571.

Upon remand, the bankruptcy court held that deferring to German law, to the extent that it would allow for the cancellation of U.S. patent licenses, would be manifestly contrary to U.S. public policy.  *In re Qimonda AG*, 462 B.R. 165, 185 (Bankr. E.D. Va. 2011).  Although the bankruptcy court acknowledged that terminating the licenses would result in greater value to the debtor's estate, it found that interest to be outweighed by the risk to substantial investments by the licensees in research and manufacturing facilities in reliance on the design freedom provided by cross-licensing agreements.  *Id*. at 182-83 (considering §1522(a) of the U.S. Bankruptcy Code). With respect to the § 1506 analysis, procedural fairness was not the issue.  *Id*. at 183.  In fact,

the objecting parties never argued that the German proceedings or German insolvency laws were procedurally unfair. *Id*. Instead, the analysis hinged on whether the application of German insolvency law would impinge on a "U.S. statutory or constitutional right such that deferring to German law would defeat the most fundamental policies and purposes of such rights." *Id*. at 184. The bankruptcy court expressed concern that terminating the licenses would result in uncertainty, which would lead to a slower pace of innovation to the detriment of the U.S. economy. *Id*. at 185. Specifically, the objecting parties argued that the uncertainty would discourage investments in research and development, as well as "construction of manufacturing facilities that are required in the … industry." *Id*. In furtherance of that argument, all but one of the objecting parties offered Professor Jerry A. Hausman as an expert witness. *Id*. at 176, n 9. He testified that eliminating the protection § 365(n) provides to licensees if the licensor files bankruptcy would impair innovation by creating uncertainty, which would ultimately impact investment decisions. *Id*. at 176. In fact, Professor Hausman posited that if § 365(n) was inapplicable then many innovative products, such as the iPhone, might have reached the market later. *Id*. at 185. Despite conflicting evidence, the bankruptcy court was persuaded by Professor Hausman's position. *Id*. According to the bankruptcy court, failing to apply § 365(n) to the facts of this case would result in uncertainty, which would ultimately impinge on the important statutory protection provided to licensees of U.S. patents. *Id*. Therefore, a separate order was entered "denying the foreign administrator's motion to amend the Supplemental Order and confirming that § 365(n) applies." *Id*.

In *In re Gold & Honey, Ltd.*, a bankruptcy court applied § 1506 and determined that recognition of an Israeli receivership proceeding as a foreign proceeding would be manifestly contrary to the public policy of the United States.  410 B.R. 357, 371 (Bankr. E.D.N.Y. 2009).  Gold & Honey, Ltd. ("GH Ltd.") and Gold & Honey (1995) L.P. ("GH LP") were debtors in non-consolidated Chapter 15 cases, as well as in administratively consolidated Chapter 11 proceedings, which were pending with the bankruptcy court before the Chapter 15 cases were filed.  *Id.* at 360.  In fact, the debtors filed their petitions for the Chapter 11 cases on September 23, 2008,[8] at which time § 362 of the Bankruptcy Code automatically stayed all litigation against GH Ltd. and GH LP.[9]  Despite the filing of the Chapter 11 cases, First International Bank of Israel ("FIBI") continued to pursue its pending application for the appointment of a temporary receiver before an Israeli Court.[10]  Ultimately, this fact led to the bankruptcy court's finding that § 1506 applied and that recognition of the foreign proceeding would be manifestly contrary to the public policy of the United States.  Specifically, the bankruptcy court refused to recognize the foreign proceeding "because such recognition would reward and legitimize FIBI's violation of both the automatic stay and [its] Orders regarding the stay."  *Id.* at 371.

In *In re Gold & Honey, Ltd.*, the debtors applied to the U.S. bankruptcy court for an order stating that the automatic stay applied to the debtors' "property wherever located and by whomever held" on October 3, 2008.  *Id.* at 363.  Agreeing with the debtors, on

---

[8] *In re Gold & Honey, Ltd.*, 410 B.R. 357, 363 (Bankr. E.D.N.Y. 2009).

[9] This Court, like the bankruptcy court in *In re Qimonda AG Bankr. Litig.*, acknowledges that courts and commentators have disagreed about whether the § 362 automatic stay may be applied extraterritorially, but finds, nevertheless, that resolution of this question would not impact the import of *In re Gold & Honey* to the facts of *In re Qimonda AG Bankr. Litig.*  *See* 433 B.R. 547, 570 n. 43 (Bankr. E.D. Va. 2010) (citing *French v. Liebmann (In re French)*, 320 B.R. 78, 81-83 (E.D. Va. 2004)).

[10] "In late July 2008, FIBI seized substantially all of GH Ltd. and GH LP's assets and accounts, and commenced the Israeli Receivership Proceeding."  *In re Gold & Honey, Ltd.*, 410 B.R. at 362.

October 6, 2008, the bankruptcy court entered an Order stating the same. *Id*. Furthermore, the bankruptcy court "advised FIBI that if it proceeded before the Israeli Court in the Israeli Receivership Proceeding, it did so at its own peril." *Id*. (citation omitted). Nevertheless, FIBI continued its actions in the Israeli Receivership Proceeding. *Id*. at 364. Thereafter, the U.S. bankruptcy court's Order and the record of the October 6 Hearing were presented to the Israeli Court. *Id*. In the Israeli Court's decision, dated October 30, 2008, it determined that neither the automatic stay nor the U.S. bankruptcy court's Order should be given effect and that the Israeli Receivership Proceeding could continue irrespective of the debtors' chapter 11 cases. *Id*. On November 30, 2008, pursuant to FIBI's application in the Israeli Receivership Proceeding, the Israeli Court appointed receivers for GH Ltd. and GH LP. *Id*. The receivers filed petitions, in the Chapter 15 cases, for recognition of the Israeli Receivership Proceeding as foreign main proceedings of GH Ltd. and GH LP. *Id*. at 365.

The bankruptcy court denied the receivers' petitions for recognition of the Israeli Receivership Proceeding as a foreign proceeding, based on the public policy exception in § 1506. *Id*. at 371-73. First, it recognized, as does this Court, that "the legislative history of Section 1506 demonstrates that this exception should be applied narrowly" so that it is "invoked only when fundamental policies of the United States are at risk." *Id*. at 372 (citing *In re Iida*, 377 B.R. 243 (B.A.P. 9th Cir. 2007); *In re Atlas Shipping A/S*, 404 B.R. 726 (Bankr. S.D.N.Y. 2009); *In re Ernst & Young, Inc*., 383 B.R. 773, 781 (Bankr. D. Colo. 2008) (citing H.R.REP. NO. 109-31(I) at 109 (2005), reprinted in U.S.C.C.A.N. 88, 172)). Next, it examined the cases relied upon by the receivers seeking recognition and distinguished them from the facts in *In re Gold & Honey, Inc. Id*. For example, the

bankruptcy court discussed *In re Ephedra Prods. Liab. Litig.,* and pointed out that the "United States District Court only approved the Ontario claims resolution procedure after the Ontario court adopted certain procedural changes requested by the United States court 'to assure greater clarity and procedural fairness.'" *In re Gold & Honey, Ltd.*, 410 B.R. at 371 (quoting *In re Ephedra Prods. Liab. Litig.,* 349 B.R. 333, 334 (S.D.N.Y. 2006)). Also, the *Gold & Honey* court noted that "jury trials in bankruptcy courts are quite rare and not typically invoked in a claims allowance process" whereas "allowing the offensive use of an automatic stay violation … would severely impinge the value and import of the automatic stay." *Id.* The bankruptcy court reasoned that recognition of a "foreign seizure of a debtor's assets post-petition would severely hinder [our] bankruptcy courts' abilities to carry out two of the most fundamental policies and purposes of the automatic stay." *Id.* Additionally, "condoning FIBI's conduct … would limit a federal court's jurisdiction over all of the debtors' property … as any future creditor could follow FIBI's lead and violate the stay in order to procure assets that were outside the United States, yet still under the United States court's jurisdiction." *Id.* (citing 28 U.S.C. § 1334(e)).

*In re Toft* is another published opinion where relief sought is denied based on the public policy exception in § 1506.  453 B.R. 186, 189 (Bankr. S.D.N.Y. 2011).  In *Toft* the bankruptcy court refused to recognize and enforce foreign orders, which would have permitted the foreign representative to access the debtor's email accounts stored on servers within the United States.  *Id.* at 188-89.  In the foreign proceeding, the foreign representative was granted a "Mail Interception Order"[11] in a German Court, and that order was later recognized and enforced by an *ex parte* order issued in an English Court.

---

[11] The Mail Interception Order permitted the foreign representative and administrator of the German estate, Prager, to intercept Toft's postal and electronic mail.  *In re Toft*, 453 B.R. at 188.

*Id.* at 188. The foreign representative argued that the U.S. bankruptcy court should "grant comity" based on §§ 1521, 1507 and 1519(a) of the Bankruptcy Code. Reviewing these statutes, among others,[12] the bankruptcy court found that "there is no doubt that the relief available under Chapter 15 … should be consistent with the principle of comity." *Id.* at 189-90 (citing *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010)). In fact, it added that § 1507 expressly provides so "with respect to 'additional assistance,' and more broadly, § 1509(b)(3) directs that once a foreign representative obtains recognition, 'a court in the United States shall grant comity or cooperation to the foreign representative.'" *Id.* at 190. However, the bankruptcy court also found that "all relief under Chapter 15 is subject to the caveat in § 1506, providing the court with authority to deny the relief requested where such relief would be 'manifestly contrary to the public policy of the United States.'" *Id.* at 191 (citing 11 U.S.C. § 1506; *In re Ephedra Prods. Liability Litig.*, 349 B.R. 333 (S.D.N.Y. 2006)). In other words, the foreign representative could not force the bankruptcy court to apply foreign laws in the U.S. proceeding by merely "making an impassioned appeal to comity." *Id.*

In the *Toft* opinion, Judge Gropper provides a detailed discussion of the applicable case law before concluding that an order of recognition as requested would violate § 1506, including the cases discussed previously in this opinion.[13] Additionally, Judge Gropper analyzed *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010), in which a bankruptcy court determined that § 1506 did not bar

---

[12] The Court addressed the Wiretap Act and the Stored Communications Act, which are both subparts of the Electronic Communications Privacy Act (the "Privacy Act"). 18 U.S.C. § 2511, *et seq.*

[13] *In re Qimonda AG Bankr. Litig.*, 433 B.R. 547 (E.D. Va. 2010); *In re Ephedra Prods. Liability Litig.*, 349 B.R. 333 (S.D.N.Y. 2006); *In re Gold & Honey, Ltd.*, 410 B.R. 357 (Bankr. E.D.N.Y. 2009).

enforcement of third-party releases that were part of a Canadian plan. *In re Toft*, 453 B.R. at 193-95.  As does this Court, Judge Gropper recognized that "those courts that have considered the public policy exception codified in § 1506 have uniformly read it narrowly and applied it sparingly." *Id*. at 195.  And that "foreign law need not be identical to U.S. law" in order to avoid violating § 1506, so it was not dispositive that U.S. law differed from German law. *Id.* at 198 (citations omitted).  Ultimately, however, the court determined that "this is one of the rare cases that calls for its application" because "any *ex parte* recognition and enforcement of the Mail Interception Order would directly contravene the U.S. laws and public policies." *Id*. at 196.  According to Judge Gropper, the question to be asked was "whether the German procedures [were] in accord with U.S. public policy," addressing:

    i.    the manner in which an order of recognition would be entered – without notice to the debtor—and

    ii.    the relief sought – that German procedures be given effect in this country regardless of the fact that they exceed traditional limits on the powers of a trustee in bankruptcy under U.S. law and constitute relief that is banned by statute in this country and might subject those who carried it out to criminal prosecution.

*Id*.  Judge Gropper rejected the foreign representative's arguments because providing the relief sought "would directly compromise privacy rights subject to a comprehensive scheme of statutory protection, available to aliens, built on constitutional safeguards incorporated in the Fourth Amendment as well as the constitutions of many States." *Id.* Said differently, these particular German procedures were not in accordance with U.S. public policy; therefore, such relief "would impinge severely a U.S. constitutional or statutory right." *Id*. at 198 (citing *In re Qimonda AG Bankr. Litig.*, 433 B.R. at 570).

*Objecting Parties' Arguments*

The Objecting Parties have raised multiple objections to Vitro SAB's Enforcement Motion. The Objecting Parties contend the *Concurso* plan should not be enforced in the United States because (1) Vitro cannot meet its burden under section 1507(b); (2) enforcing the plan would violate the manifest public policy of the United States; and (3) Vitro has not met the requirements for issuing an injunction.

<u>Section 1507(b)</u>

The Objecting Parties assert that Vitro SAB cannot meet any of the section 1507(b) requirements to enforce the plan. The Objecting Parties contend the plan violates: (1) subsection (b)(1) by discriminating between foreign and non-foreign creditors; (2) subsection (b)(2) by protecting creditors from the inconvenience in the processing of claims in the foreign proceeding; (3) subsection (b)(3) by failing to reasonably assure the prevention of fraudulent transfers; and (4) violates subsection 1507(b)(4) by failing to distribute the proceeds of the estate in substantial accordance with the Bankruptcy Code.

Specifically, the Objecting Parties assert that the *Concurso* plan discriminates between foreign and non-foreign creditors by giving creditors with guaranties the same treatment as other unsecured creditors, by the "death trap" provision of the plan which penalizes the Objecting Parties, and by the allocation of value to creditors' claims in accordance with the face amount, not the total amount, of their claim. The Objecting Parties assert that the *Concurso* plan violates subsection 1507(b)(2) by treating the non-debtor guarantors as debtors, and by not providing an opportunity for creditors of the non-debtor guarantors to vote. The Objecting Parties also assert that the *Concurso* plan

encourages fraudulent transfers; and that the *Concurso* plan does not distribute proceeds of the estate in accordance with Title 11 because the plan fails to follow the absolute priority rule under 11 U.S.C. § 1129, and because it grants equity interests substantially more than they would likely receive in a Chapter 11 bankruptcy.

In addition, the Objecting Parties urge the Court to invoke the § 1506 "public policy exception" by refusing to grant any action that is manifestly contrary to the public policy of the United States. The Objecting Parties contend enforcing the *Concurso* plan violates the public policies of (1) the absolute priority rule; (2) discharging non-debtor debts; (3) good faith dealing; (4) enforcement of negotiated instruments; (5) the prohibition of vote buying; and (6) violated many, if not all, of the protections afforded creditors under Title 11.

As part of their public policy argument, the Objecting Parties assert that enforcing the *Concurso* plan will erode the status of the United States as a financial center, harming the United States and other nations. The Objecting Parties argue refusing to protect creditors bargained for protections from foreign courts will signal to bond markets U.S. law does not protect creditor rights, harming banks. Finally, the Objecting Parties contend the plan will harm the Mexican economy by raising interest rates on Mexican companies.

The Objecting Parties further argue the Mexican process violated United States notions of an impartial and disinterested tribunal, based on the *Conciliador's* alleged financial interest and the *Conciliador's* accounting firm's relationship with Vitro SAB. The Objecting Parties also believe a lack of transparency in the Mexican Proceeding violated due process.  Additionally, the Objecting Parties contend several standing issues

prevented them from receiving due process.  The Objecting Parties allege the systemic corruption of the Mexican judiciary undermines confidence in the judiciary as a whole. In support of this corruption argument, the Objecting Parties cite reports by, among others, the U.S. State Department, United Nations, World Bank, Transparency International.

### Conclusions by the Court

Having reviewed the evidence and considered the testimony of witnesses over four days, this Court believes that a portion of the *Concurso* plan should not be enforced as presented.  However, the Court will first address certain of the Objecting Parties' arguments that must be overruled.

### Overruled Objections

#### Corruption Argument

The Objecting Parties have argued that the judicial system in Mexico is corrupt and its rulings should not be respected by this Court.  Their expert, Dr. Stephen D. Morris, who testified for the Objecting Parties on this point appeared to be a knowledgeable and qualified witness on corruption in Mexico generally, but the application of his studies to the Vitro proceedings was not persuasive.  Further, the Objecting Parties' own Mexican counsel testified that in his forty years of practice he had not bribed an official.  To date, this Court has not seen evidence that the Mexican Proceeding is the product of corruption, or that the LCM itself is a corrupt process.

#### Impact on the Credit Markets

The Objecting Parties offered the expert testimony of Dr. Elaine Buckberg, a former economist at the International Monetary Fund, who testified that confirmation of the *Concurso* plan will have an adverse impact on the financial markets in the United

States.  She testified credibly that approval of the *Concurso* plan in the United States will adversely impact the attractiveness of the United States to foreign issuers.  Although Dr. Buckberg was a good witness and credible, she was unable to quantify the effect.  For example, she could not testify as to the amount of any increase in rates for indentures for Mexican companies if the *Concurso* plan was enforced.  For these reasons, the Court is unable to conclude that approval would have an adverse impact on credit markets.

*Unfairness Argument*

A number of the objections raised by the Objecting Parties fall under the category of general unfairness.  For example, they emphasize that Vitro SAB had many *ex parte* meetings with the presiding judges.  *Ex parte* contact with judges is apparently common in Mexico; in fact, the Objecting Parties' counsel had *ex parte* meetings of their own.  And they say that the Mexican courts did not consider their objections.  However, the changes made to the *Concurso* plan suggest that at least some of their concerns were addressed.  In any event, such a complaint is better raised in Mexico in the appeal that has been filed.  Finally, they complain that the *Conciliador* was not disinterested.  Such argument is for the Mexican court system.

On the whole, this Court cannot conclude that the *Concurso* proceeding was unfair to the Objecting Parties.

*Violations of Mexican Law and Process*

The Objecting Parties have raised a number of objections concerning the process in Mexico.  Those issues of Mexican law will have to be decided by the Mexican courts.

*Meritorious Objections—Arguments That Preclude Enforcement*

*Third Party Releases*

For the past year, this Court has expressed concerns regarding the most problematical part of the Mexican Proceeding, the extinguishment of claims held by the Objecting Parties against non-debtor subsidiaries, entities which did not avail themselves of protection in the Mexican Proceeding. *In re Vitro S.A.B. De C.V.*, 455 B.R. 571 (Bankr. N.D. Tex. 2011). This Court expressed its views at that time that it had grave concerns about any plan in Mexico that would protect non-filing subsidiaries that guaranteed United States indentures. However, Vitro SAB proceeded with such a plan anyway.

Generally speaking, the policy of the United States is against discharge of claims for entities other than a debtor in an insolvency proceeding, absent extraordinary circumstances not present in this case. Such policy was expressed by Congress in Bankruptcy Code Section 524, and in numerous cases in this circuit. *See, e.g., Matter of Zale Corp.*, 62 F.3d 746 (5th Cir. 1995). This protection of third party claims is described both in terms of jurisdiction and also as a policy. *See id.* at p. 102, n. 28.

The Fifth Circuit has largely foreclosed non-consensual non-debtor releases and permanent injunctions outside of the context of mass tort claims being channeled toward a specific pool of assets. *See In re Pacific Lumber Co.*, 584 F.3d 229, 252 (5th Cir. 2009), rev'd on other grounds, *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. ___, 2012 WL 1912197 (2012).

In its argument, Vitro SAB points to the *Metcalfe & Mansfield Alt. Invs.*, decision discussed above that enforced a Canadian Order that allowed for a limited third party release. 421 B.R. 685, 688. However, in *Metcalfe*, there was no question that the

Canadian Proceedings should be recognized as a foreign main proceeding.  Instead, the issue arose in enforcement of the Canadian Orders which contained a third-party non-debtor release and an injunction. *Id*.

The facts in *Metcalfe* differ from the facts in the present case.  In *Metcalfe*, there was near unanimous approval of the plan by the creditors, who were not insiders of the debtor.  Also, the plan was negotiated between the parties and there appears not to have been a timely objection to the order.  Finally, the language of the opinion indicates that the release was not complete like the one in the present case.

For three reasons the Enforcement Motion must be denied.

*Section 1507*

The *Concurso* Approval Order does not provide for the distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by Title 11.  *See* 11 U.S.C. § 1507(b)(4).  Under a Chapter 11 plan, the noteholders would receive their distribution from the debtor and would be free to pursue their other obligors, in this case the non-debtor guarantors.  The *Concurso* plan provides drastically different treatment in that the noteholders receive a fraction of the amounts owed under the indentures from Vitro SAB and their rights against the other obligors are cut off.

*Section 1521*

Second, the *Concurso* Approval Order neither sufficiently protects the interests of creditors in the United States, nor does it provide an appropriate balance between the interests of creditors and Vitro SAB and its non-debtor subsidiaries.  One could argue that Vitro SAB, as a holding company, is trying to achieve, through its *Concurso* plan, an entrustment of the distribution of the assets of its non-debtor U.S. subsidiaries without sufficiently protecting the Objecting Creditors, pursuant to §§ 1521(b) and 1522(a).

*Public Policy*

The expression by Congress in § 524, paired with the case law in this Circuit, lead this Court to conclude that the protection of third party claims in a bankruptcy case is a fundamental policy of the United States.  The *Concurso* Approval Order does not simply modify such claims against non-debtors, they are extinguished.  As the *Concurso* plan does not recognize and protect such rights, the *Concurso* plan is manifestly contrary to such policy of the United States and cannot be enforced here.

*Possible Meritorious Objections*

As noted above, this Court sustains the Objecting Parties' primary objection, that the *Concurso* plan improperly released claims against non-debtors in violation of § 1507, 1521 and the public policy of the United States.  However, there are two other strong objections that this Court notes for the appellate court, but does not reach, because the Court has sustained the objection to the release of the third party claims against the non-debtor subsidiaries.

*Voting Irregularities*

The noteholders have raised and submitted evidence of at least suspect voting on the *Concurso* plan.  The Mexican court allowed insiders to vote and counted such votes, which swamped the noteholders' votes.  *See* Testimony of Mr. Claudio del Valle.  In fact, it is undisputed that Vitro issued bonds to insiders as a defense shortly before the *Concurso* plan was filed, and such votes were cast and counted.  *Id.*  Allowing insiders to vote, including the subsidiaries who voted to extinguish their own guarantees to the Objecting Parties, gives the Court pause.  This argument, however, may be one of Mexican law, which should be decided by a court in Mexico.

*Absolute Priority Rule*

Under the *Concurso* plan, equity retains a value of approximately $500 million. Creditors, such as the Objecting Parties, are not paid in full. Such a plan would violate the absolute priority rule in the United States. By allowing the retention of equity, and, at the same time, not paying the Objecting Parties in full, the *Concurso* plan arguably runs afoul of § 1507 because the result is demonstrably different than would occur in Chapter 11.

The wide variance in return to creditors from what would be expected in a Chapter 11 plan in this country was the subject of testimony by Dr. Joseph W. Doherty, an expert put forth by the Objecting Creditors. His testimony was credible.

## IV.   Conclusion

Accordingly, this Court concludes that the *Concurso* plan approved in this instance, which extinguishes the guarantee claims of the Objecting Creditors that were given under an indenture issued in the United States against non-debtor entities that are subsidiaries of Vitro, should not be accorded comity to the extent it provides for the extinguishment of the non-debtor guarantees of the indentures. Such order manifestly contravenes the public policy of the United States and is also precluded from enforcement under §§ 1507, 1521 and 1522 of the Bankruptcy Code.

Generally, reorganization pursuant to the LCM is found to be a fair process, worthy of respect. In other and subsequent cases this Court would expect that *Concurso* decisions would be enforced in this country. However, if approved for enforcement, the present order would create precedent without any seeming bounds. The *Concurso* plan presently before the Court discharges the unsecured debt of non-debtor subsidiaries.

What is to prevent this type of plan from eventually giving non-consensual releases to discharge the liabilities of officers, directors, and any other person?

Because of the importance of this case to the financial and legal community, the Court will stay its decision until June 29, 2012, at 5:00 p.m. Central Daylight Time, and will maintain the TRO for fourteen days to allow Vitro time to appeal and to seek a stay on appeal.  Any further stay or extension of the TRO should be sought from the district court or court of appeals.

The Objecting Parties shall submit an order consistent with this decision within ten days from the date of entry of this opinion.

###End of Memorandum Opinion###